IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

```
UNITED STATES OF AMERICA      :
                              :      CRIMINAL ACTION
           v.                 :
                              :      NO: 1:12-CR-190-TWT-ECS
REX ANYANWU                   :
                              :
```

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

**I.**
**Introduction**

This matter is before the Court on the Defendant's motion to suppress evidence seized during the warrantless search of his home after he was arrested there on a federal arrest warrant on the morning of May 22, 2012. [Doc. 46]. Defendant argues that the protective sweep performed by the government agents at the time they entered Defendant's house violated Defendant's Fourth Amendment rights. [Doc. 56 at 7]. Defendant further contends that the consent to search signed by Defendant's wife was involuntary and tainted by the illegal sweep. [Id. at 14]. The government opposes the motion, arguing that the sweep was not illegal and that the consent given by Defendant's wife was voluntary and untainted by the sweep, even if it were illegal. [Doc. 59 at 11].

The Court heard evidence on the motion to suppress on December 5, 2012, and the testimony has been transcribed and filed of record.

[Doc. 54]. The parties were asked to brief the issues and the briefs have been filed. The undersigned has reviewed the record, the briefs and the applicable law, and, for the reasons stated below, **RECOMMENDS** that the motion to suppress be **GRANTED**.

## II.
### Fact and Circumstances of the Arrest and Search

On or shortly before May 22, 2012, agents of the Bureau of Alcohol, Tobacco and Firearms ("BATF") obtained an arrest warrant for Defendant, charging him with visa fraud. [T. 6-7]. The agents had also obtained a search warrant for Defendant's place of business and one of his automobiles. [T. 6]. Agent Ken Heerlein was the lead agent on the case. [Id.]. At around 6:50 in the morning, [T. 31], Agent Heerlein and between eight and nine other federal agents and Douglas County police converged on Defendant's home address at 1830 Silver Creek drive in Lithia Springs, planning to arrest Defendant. [T. 8]. As many as nine vehicles pulled up in front of and near the property, [T. 30], including two Douglas County police cruisers, and about six agents approached the front door, while several others covered the back. [T. 31, 57].

Agent Heerlien knocked at the door and announced that they were there to arrest Defendant. [T. 8]. Defendant's wife, Mrs. Anyanwu, answered the door and allowed the officers to come into the house. [T. 8-9]. At least six to seven officers came in. [T. 10].

2

Defendant, Mr. Rex Anyanwu, was coming down the stairs, and he was immediately secured by the officers, who patted him down and handcuffed him. [T. 9]. As they entered the house, four to six agents also immediately performed what they characterized as a "protective sweep" of the residence. [T. 37]. There were three people in the home—Defendant, his wife, and Defendant's eight- or nine-year-old stepdaughter. [T. 9]. The agents helped the stepdaughter get ready for school and escorted her out to the bus. [T. 50].

After the sweep and after he was detained and handcuffed, Defendant was sat down by the agents at the kitchen table. [T. 10]. Defendant's wife was also taken to the table and sat down with her husband. [T. 10]. Defendant was then read his Miranda[1] rights, which he invoked, declining to talk with the agents. See Gov. Ex. 2; [T. 12-13, 51]. He declined to waive and invoked his rights at 7:01 in the morning. [T. 13, 35].

During the sweep, one of the agents saw an I-290B immigration form on a desk in an upstairs bedroom, which the agents believed might be relevant to the visa fraud charges pending against Defendant. [T. 20, 42]. When they initially entered the house, they did not intend to search the house. [T. 35]. Agent Heerlein did not

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

3

believe that he had probable cause to search the residence and he also did not have a search warrant. [T. 27]. As a result of finding the I-290B form, however, they decided to ask for consent to search. [T. 38].

Because Defendant invoked his rights, the agents directed the request for consent to his wife, who also was believed to have an interest in the premises. [T. 12-13, 15]. Agent Kim Richardson prepared a consent form in the names of both Mr. and Mrs. Anyanwu and presented it to Mrs. Anyanwu. [T. 15, 17, 52]. The agent read the form to Ms. Anyanwu and she, in turn, asked her husband if it was okay for her to sign it. [T. 53, 59-60 ]. He said yes, though it did not appear he wanted to sign it or that he did sign it himself. [T. 16, 53, 60]. Ms. Anyanwu signed it. [T. 15, 54]. She signed this document at 7:22 in the morning. [T. 38-39].

When the agents arrived to make the arrest, they had no reason to believe there would be anyone else in the home other than Defendant, his wife, and the stepdaughter. [T. 27, 35]. They also had no reason to believe there were any weapons in the home and they did not expect to find any weapons. [T. 11, 33]. Furthermore, neither of the officers who testified articulated any specific facts that would have warranted a reasonable officer in believing that the remainder of the house harbored anyone who would pose a danger on the scene. The officers testified that they performed the sweep

4

"for safety," [T. 10, 48], without elaboration. Both testified that they would perform a sweep, as standard procedure, every time they made such an arrest, regardless of the nature of the crime charged. [T. 11, 36, 48].

## III.
## Discussion

   A. Protective Sweep

The "chief evil" against which the Fourth Amendment is directed is a government agent's warrantless physical entry of a person's home. See Payton v. New York, 445 U.S. 573, 585, 100 S. Ct. 1371, 1379-80 (1980); see also Coffin v. Brandau, 642 F.3d 999, 1009 (11th Cir. 2011) (en banc). The Fourth Amendment does not, however, require that all searches and seizures be accompanied by the issuance of a warrant. United States v. Goddard, 312 F.3d 1360, 1362 (11th Cir. 2002). Indeed, "for Fourth Amendment purposes, an arrest warrant founded upon probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives where there is reason to believe the suspect is within." Payton, 445 U.S. at 603, 100 S. Ct. at 1388.

Furthermore, the Fourth Amendment allows for warrantless protective sweeps of a defendant's home to ensure the safety of police officers and others. Maryland v. Buie, 494 U.S. 325, 336–37, 110 S. Ct. 1093, 1099–1100 (1990). "In [Buie], the Supreme Court

5

held that a properly limited protective sweep, conducted incident to an arrest, is permitted under the Fourth Amendment only 'when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" United States v. Chaves, 169 F.3d 687, 691 (11th Cir. 1999) (citation omitted). The Court in Buie permitted police officers to perform protective sweeps in such instances because of the compelling "interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack," emphasizing that the intrusion was limited to "no more than necessary to protect the officer from harm." Id. at 333, 110 S. Ct. at 1099–1100; Chaves, 169 F.3d at 691.

In this case, however, there was a complete absence of specific and articulable facts sufficient to support a reasonable belief that the area to be swept harbored an individual posing a danger to those on the arrest scene. Neither of the agents who testified articulated any such facts, other than to recite that the sweep was done for safety of the officers and others, and is standard operating procedure in every case where an arrest is made. [T. 10-11, 36, 48]. Indeed, the facts known by the agents negated any such reasonable belief. The agents did not expect to find any weapons

6

and had no reason to believe they would find any weapons. [T. 11, 33]. The agents had no reason to believe that there were any other persons on the premises other than Defendant, his wife, and his step daughter, all of whom were present and secured as soon as the agents entered the house. [T. 27, 35]. The agents knew that the premises were Defendant's home and that he lived there with his family. The offense for which Defendant was being arrested, visa fraud, was not inherently violent or associated with violence.

"The legality of the protective sweep is a difficult question. It requires balancing two deeply important interests—the lives of law enforcement officers and the constitutional right of the people to be secure in their homes under the Fourth Amendment." United States v. Delancy, 502 F.3d 1297, 1307 (11th Cir. 2007). Nevertheless, the Supreme Court in Buie made it clear that such a search of an arrestee's home could only be justified under limited circumstances. And in this case, the government has not carried its burden of showing that the limited circumstances were present. At best, the agents relied upon the fact that they did not know if there was anyone else in the house, as opposed to specific and articulable facts showing that there was someone posing a danger in the house. Such lack of information is not enough. Chaves, 169 F.3d at 692; accord United States v. Colbert, 76 F.3d 773, 778 (6th Cir. 1996)("Lack of information cannot provide an articulable basis upon

7

which to justify a protective sweep."); see also Sharrar v. Felsing, 128 F.3d 810, 825 (3d Cir. 1997) ("agree[ing] with . . . Colbert that '[n]o information cannot be an articulable basis for a sweep that requires information to justify it in the first place'").

In summary, therefore, the undersigned finds that the protective sweep of Defendant's home was unauthorized under Buie and in violation of the Fourth Amendment.

B. Voluntariness of the Consent to Search

"Under controlling case law, we are required to conduct two separate inquiries where a consent to search follows prior illegal activity by the police. First, a court must determine whether the consent was voluntary. Second, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the 'fruit of the poisonous tree'——the product of an illegal entry." Delancy, 502 F.3d at 1308. This two-step approach is mandatory, and the government bears the burden on both issues. Id. Accordingly, it is necessary first to address the voluntariness of Mrs. Anyanwu's consent in this case.

Law enforcement officers, without a warrant, may conduct a search based upon an individual's voluntary consent, and evidence discovered and seized during such a search may be admitted at trial. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44 (1973). Consent may be express or implied but need not

8

necessarily be knowing and intelligent. Id. at 241, 93 S. Ct. at 2055.² In order for consent to be deemed voluntary, it "must be the product of an essentially free and unconstrained choice." United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989)). "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." Florida v. Royer, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983); accord Schneckloth, 412 U.S. at 233-34, 93 S. Ct. at 2051; Zapata, 180 F.3d at 1241; United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986).

Whether or not voluntary consent has been given is a question of fact determined by examining the totality of the circumstances. Schneckloth, 412 U.S. at 226-27, 93 S. Ct. at 2047-48; United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996), overruled on other grounds by Arizona v. Gant, 556 U.S. 332, 129 S. Ct. 1710 (2009); Tukes v. Dugger, 911 F.2d 508, 517-18 (11th Cir. 1990). Various factors may be considered in determining whether consent is

---

² Knowledge of the right to refuse consent, however, is one factor to consider in evaluating voluntariness. Schneckloth, 412 U.S. at 227, 93 S. Ct. at 2047.

9

voluntary, including: (1) an individual's knowledge of the right to refuse consent; (2) his or her youth, intelligence, lack of education, and language ability; (3) the degree to which the defendant cooperates with the police; (4) the defendant's attitude about the likelihood of discovery of illegal substances; and (5) the length of detention and the nature in which the defendant is questioned, including physical punishment or other coercive police behavior. Schneckloth, 412 U.S. at 226, 93 S. Ct. at 2047; United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001); United States v. Butler, 102 F.3d 1191, 1197 (11th Cir. 1997).

Considering the totality of the circumstances , the undersigned concludes that Ms. Anyanwu's consent to the search of her house was not voluntary.  There should be no question that the circumstances surrounding the officers' appearance at the door and quick entry into the house would have been intimidating to anyone in the position of Mrs. Anyanwu.  She answered the door early in the morning, at a time when it was still dark or barely dawn.  She was confronted by five or six police officers outside the front door who immediately came into the house to arrest her husband.  The officers had guns.  Nine police vehicles were parked all around in front of her house, two of which were Douglas County police cruisers.

As soon as the officers came in they detained her husband and put him in handcuffs.  They also immediately went throughout the

house, upstairs and down, conducting a search. What they were searching for, and how extensive it was, Mrs. Anyanwu could not know, because, after the officers escorted her nine-year-old daughter out to the school bus, they sat her down at the kitchen table with her handcuffed husband. She was not under arrest, but she could hardly have felt as if she was free to go. By this time, the officers had completed their search of the house.

While all of this was going on, and while seated at their kitchen table, the Defendant, Mr. Anyanwu, was read his rights and declined to talk or answer questions. Mrs. Anyanwu was not read her rights, but, instead, after one of the agents had seen an immigration document during their search of Mr. And Mrs. Anyanwu's upstairs bedroom, the officers asked Mrs. Anyanwu to consent to a search of her house.[3] She looked to her husband, who indicated to her that she might as well sign the consent form, and so, she did.

The ultimate effect of all the above circumstances was to render her consent involuntary, made in submission to a substantial showing of official police authority, compounded by the fact that, as far as she would have known, her house had already been searched

---

[3] The form also included the right to search a car that was apparently at the premises.

when they asked for her consent. Nine police cars were outside;[4] six agents with guns had already rummaged through the house; others were surrounding the outside; her husband was in handcuffs. Any reasonable person would have feared what would happen to them if they did not consent, despite being told they could refuse.

As noted above, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given. That burden is not satisfied by showing a mere submission to a claim of lawful authority. Royer, 460 U.S. at 497, 103 S. Ct. at 1324. In this case, Mrs. Anyanwu's consent was the product of a mere submission to a claim of lawful authority—not "the product of an essentially free and unconstrained choice." Zapata, 180 F.3d at 1241.

I find this case to be like United States v. Tovar-Rico, 61 F.3d 1529 (11th Cir. 1995), where consent was found to be involuntary under similar circumstances. In Tovar-Rico, as in this case, police officers knocked loudly at Tovar-Rico's door, announced their identity as police officers, and requested permission to enter. Id. at 1535. They then entered quickly, as in this case, with guns drawn, to do a protective sweep. Id. They did not, however, have an arrest warrant, as in this case. Then, as in this

---

[4] "It's a visual effect of, okay, these are real cops coming to my door." [T. 29].

12

case, a protective sweep was conducted while Tovar-Rico ("Tovar") was seated at the dining room table. Id.  Tovar was then asked for permission to search the apartment again. Id. at 1535-36.  As here, Tovar was advised that she did not have to permit the search, but, unlike this case, she was told that if she did not the agents would come back with a search warrant. Id. at 1536.  She signed the written consent form. Id.

The magistrate judge, approved by the district judge, found Tovar's consent involuntary, stressing "that Tovar had already observed the officers explore every room in the apartment and could not reasonably have known that she could still refuse a search." Id. The Eleventh Circuit agreed, finding no doubt that Tovar opened the door in response to a "show of official authority" and could not be deemed to have consented to the agent's entry or to have voluntarily consented to the search. Id.

While Tovar-Rico can be distinguished on the basis that the *entry* was illegal in that case, whereas the officers in this case had an arrest warrant permitting them to enter, I do not find that this distinction makes a difference.  In both cases the resident was confronted with and acquiesced to a show of official authority. And, while in the Tovar-Rico case, unlike this case, the officers did advise Tovar that they could get a warrant if she did not consent, the fact remains that in both cases the officers had

13

already searched the house, and, in my view, Mrs. Anyanwu, like Tovar, could not have reasonably believed that she could refuse.

In summary, I conclude that Mrs. Anyanwu's consent was not voluntary.

C. "Fruit of the Poisonous Tree"

Under the second part of the two-part inquiry required in cases where consent to search follows prior illegal activity, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the "fruit of the poisonous tree"—that is, the product of an illegal entry. Delancy, 502 F.3d at 1308. As stated by the Court in United States v. Santa, 236 F.3d 662, 676-77 (11th Cir. 2000), and quoted by the Court in Delancy:

> For consent given after an illegal seizure to be valid, the Government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure. Thus, the voluntariness of consent is only a threshold requirement; a voluntary consent to search does not remove the taint of an illegal seizure. Rather, the second requirement focuses on causation: "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

Delancy, 502 F.3d at 1308 (quoting Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417 (1963)) (citations omitted); see also United States v. Ramirez-Chilel, 289 F.3d 744, 752 n.9 (11th

14

Cir. 2002) ("Typically, if the ensuing search occurs after an initial illegality, such as an illegal entry or an illegal arrest, we must first determine whether the consent to search was voluntary and then, whether the consent was tainted by the initial illegality.").

In Delancy, federal officers came to the home of one Godfrey, looking to question Delancy. 502 F.3d at 1301. They did not have an arrest warrant. Id. As they approached, the door to the house opened and closed and officers saw Delancy hiding something in the couch near the door. Id. Moments later a woman exited and Delancy followed. Id. The officers handcuffed Delancy and took him into custody. Id. Officers then entered the home to do a protective sweep. Id. During the sweep, officers encountered Godfrey, the Defendant's girlfriend, and two children. Id. The officers asked Godfrey for consent and she consented, orally and in a written consent form. Id. The lower court found the consents to be freely, knowingly, and voluntarily given. Id. at 1305. The appeals court accepted these findings but, further, assumed that the protective sweep violated the Fourth Amendment. Id. at 1308.

The appellate court then went on to examine the Fourth Amendment issue of whether, even though consent was voluntary, it was nonetheless tainted by the illegal entry and sweep. Id. Putting it another way, the Delancy Court stated: "We are obliged to

15

determine whether the consent was 'sufficiently an act of free will to purge the primary taint of the unlawful invasion,' or, alternatively, whether the causal connection had 'become so attenuated as to dissipate the taint.'" Id. at 1309 (quoting Wong Sun, 371 U.S. at 486-87, 83 S. Ct. at 417).

Finding this determination to be a fact-specific question, the Delancy Court considered three non-exhaustive factors in determining whether Godfrey's consent was tainted by the illegal arrest: "[1] the temporal proximity of the seizure and the consent, [2] the presence of intervening circumstances, and, particularly, [3] the purpose and flagrancy of the official misconduct." Id. at 1309 (quoting Santa, 236 F.3d at 677). The Court also noted other factors, including "whether the seizure brought about police observation of the particular object which they sought consent to search . . . ." Id. at 1310 (quoting 4 Wayne R. LaFave, Search and Seizure § 8.2(d) (4th ed. 2004).

Analyzing these factors, the Court found that temporal proximity, though relevant, was not the most important factor, even though the interval between the alleged act and the consent was short. Id. at 1311. The Court found that the review and signing of the consent form provided a thorough notification of Godfrey's rights and was an important intervening circumstance. Id. at 1311-12. The fact that Godfrey was informed and aware of her rights and

16

the signed consent form, while not dispositive, "support[ed] the government's argument that the causal connection between the entry and the consent had 'become so attenuated as to dissipate the taint.'" <u>Id.</u> at 1312 (quoting <u>Wong Sun</u>, 371 U.S. at 486-87, 83 S. Ct. at 417).

As for flagrancy, the <u>Delancy</u> Court found that even though the entry may have been unlawful, the police did not enter for an unlawful purpose. <u>Id.</u> at 1312. The Court found that the entry, even if unlawful, was not flagrantly so. <u>Id.</u> The Court then found that "[m]ost importantly there is no suggestion that the police exploited the evidence found prior to consent." <u>Id.</u> at 1313. The Court noted that the detective was unaware that drugs had been found until after Godfrey consented to the search. <u>Id.</u>

Taking all the factors together and evaluating them as a whole, the <u>Delancy</u> Court concluded that the illegal entry did not taint Godfrey's consent. <u>Id.</u> The Court discounted the temporal factor, relied heavily on the advice of rights, noted that there was no unlawful purpose, and observed that "[w]hat evidence they did find, they did not exploit." <u>Id.</u> at 1314. The Court went on to note that because the police did not exploit their unlawful actions, the purpose of the exclusionary rule would not be served by suppressing this evidence, <u>id.</u>, and the social cost of suppressing large quantities of drugs, tens of thousands of dollars of cash, and a

17

loaded AK-47 in the possession of a convicted felon "is obvious." Id. Accordingly, the Court affirmed the District Court's denial of the motion to suppress.

While the instant case invites comparison with Delancy, certain distinctions lead me to recommend a different result. Here the temporal proximity was close: the sweep was completed shortly after seven in the morning and the consent was sought and obtained at 7:22 in the morning, no more than twenty minutes after the search. Mrs. Anyanwu had just witnessed the officers searching throughout her house, including the upstairs where her bedroom was, before she signed. As for the circumstances of the consent, they are similar in both cases, except that I conclude that Mrs. Anyanwu's consent was involuntary, for the reasons stated above. And, as for flagrancy, while I cannot conclude that the officer's conduct in conducting the sweep was subjectively in bad faith, their conduct was flagrant in the sense that there was no effort at all to comply with the Supreme Court's directive that such searches only be undertaken where the officers have specific and articulable facts to justify the sweep. Here they have articulated no such justification, except that they did so in every case. But to allow agents to search with impunity every residence entered in connection with the execution of an arrest warrant, regardless of the

18

circumstances, would necessarily sanction repetitive violations of the Fourth Amendment such as occurred here.

What particularly distinguishes this case from Delancy is the evidence indicating that the agents were aware that an immigration document had been seen in the upstairs bedroom and that they had not intended to search the house until after they saw that document. [T. 38]. It was seeing this document during the sweep that motivated the officers to ask for consent. [Id.]. But for the sweep and their having seen this document, in other words, the agents would not have asked for consent and there would have been no search. This fact, in particular, when weighed in the balance with all the other facts and circumstances, leads me to conclude that what was seen in the first illegal search became the catalyst for the request for consent to the second search and that the consent and consequent second search and seizure were, therefore, tainted by the illegality of the officers' unlawful protective sweep. Under these circumstances, unlike in Delancy, the evidence should be **SUPPRESSED.**

## IV.
## Conclusion

For the reasons set forth above, the undersigned finds that the protective sweep that was conducted as the officers entered Defendant's residence was unauthorized under Buie and violated the Fourth Amendment. As for the consent that was obtained from Mrs.

19

Anyanwu within twenty minutes after the sweep, the undersigned finds that it was involuntary.  Finally, the undersigned finds that regardless of whether the consent was voluntary, the consent to search a second time was nonetheless tainted by the illegality of the officers' initial unlawful protective sweep.

Accordingly, **IT IS RECOMMENDED** that the motion to suppress evidence seized from Defendant's home,[5] [Doc. 46], be **GRANTED**.

**SO REPORTED AND RECOMMENDED**, this 18th day of March, 2013.

        s/ *E. Clayton Scofield*
E. CLAYTON SCOFIELD III
UNITED STATES MAGISTRATE JUDGE

---

[5] There was no evidence at the hearing indicating that the government would seek to introduce anything found in the vehicle listed on the consent. Nevertheless, the consent would be invalid as to the vehicle search as well as the residence search, if this recommendation is adopted.

20